# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,       ) | |

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )          Case No.: 2:09-cr-00113-GMN-PAL
                                         )
        vs.                              )
                                         )                    **ORDER**
LUIS VEGA-RUBIO, et al.,                 )
                                         )
                    Defendants.          )
_____ )

Pending before the Court are nine (9) Motions in Limine.  Defendant Roberto Lopez filed a Motion to Seat Defendants at Counsel Table Nearest to the Jury (ECF No. 183), which is DENIED.  The Government has filed a Motion to Exclude Polygraph Evidence (ECF No. 187), which is GRANTED.  The Government has also filed a Motion to Admit Statements of Defendant Lopez-Buelna (ECF No. 188), which is GRANTED.  The Government filed a Motion to Play Surveillance Tape (ECF No. 197), which is GRANTED.  Defendant Lopez-Buelna has filed a Motion to Exclude Statements of Co-Defendant Vega-Rubio (ECF No. 200), which has been withdrawn.  Defendant Lopez-Buelna has also filed a Motion for a Jury Questionnaire (ECF No. 201), which is DENIED.  Defendant Webster has filed a Motion to Exclude Drug Organization Evidence or Opinion Evidence (ECF No. 204), which is DENIED.  Defendant Webster has also filed a Motion for Exclusion of Testimony Concerning Defendant Webster's Prior Drug Use (ECF No. 209), which is GRANTED.  Finally, Defendant Lopez-Buelna has filed a Motion to Preclude the Use of the Transcript from his Plea Hearing (ECF No. 215), which is GRANTED.

The Court briefly addressed these motions at Calendar Call on Tuesday, January 18, 2011; however, the hearing was continued until Thursday, January 20, 2011 to allow the parties to file additional documents.

# I.    BACKGROUND

The jury trial in this case is scheduled to begin on January 25, 2011.  There will be four defendants tried at that time.  Defendant Jose Lopez-Buelna is charged with one count of Conspiracy to Distribute a Controlled Substance, one count of Conspiracy to Launder Money, two counts of Money Laundering Promotion, one count of Conspiracy to Commit Kidnapping, one count of Kidnapping, one count of Conspiracy to Commit Hostage Taking, and one count of Hostage Taking.  Defendant Erik Dushawn Webster is charged with one count of Conspiracy to Distribute a Controlled Substance, one count of Conspiracy to Launder Money, and one count of Money Laundering Promotion.  Defendant Roberto Lopez is charged with one count of Conspiracy to Distribute a Controlled Substance and one count of Conspiracy to Launder Money.  Defendant Luis Vega-Rubio is charged with one count of Conspiracy to Commit Kidnapping, one count of Kidnapping, one count of Conspiracy to Commit Hostage Taking, and one count of Hostage Taking.

These charges stem from a series of events beginning in 2007.  At that time, Clemens Tinnemeyer was allegedly a methamphetamine customer and low-level drug seller who was allegedly recruited by Defendant Lopez-Buelna to distribute cocaine from a motor home and transport the monetary proceeds from the drugs to Mexico.  Tinnemeyer brought his friend Terri Leavy on various cocaine distribution trips originating in Las Vegas and together they traveled to Atlanta, New York, and Chicago.

In the summer of 2008, Tinnemeyer and Leavy allegedly became unhappy with the operation and decided to ignore instructions to go to Chicago.  Instead, Tinnemeyer and Leavy allegedly took $4.5 million in U.S. currency that they had found in a hidden compartment of the motor home and fled to the Gulf Coast of Mississippi, breaking off all contact with Defendant Lopez-Buelna and his associates.

Defendant Lopez-Buelna attempted to reestablish contact with Tinnemeyer, but it was

to no avail.  Consequently, on July 13, 2008, Defendant Vega-Rubio allegedly delivered to Tinnemeyer's daughter a note that read:

> For your Dad.  We are waiting for you to get here.  Or to call the people you know.  The people get wait know more.  So we give you one week to report your self.  And to get here.  We know about all your family. Where they are at.  So you call us.  And you know were at or you know what going to happen.  WE DON'T PLAY KNOW GAMS.

The note was reported to the Las Vegas Metropolitan Police Department.  Defendant Vega-Rubio was identified as the person who had delivered the note and the police department was able to recover a latent print from the note matching Defendant Vega-Rubio's print.  When he was arrested on February 24, 2009, Defendant Vega-Rubio admitted that he had written the note, but denied that he had delivered it to the residence of Tinnemeyer's daughter.

Tinnemeyer was contacted by his daughter and he allegedly informed her that there had been a misunderstanding but he would take care of the matter.  In August of 2008, Tinnemeyer and Leavy allegedly moved the money from Mississippi to Riverside, California.

On the morning of October 15, 2008, three months after the note was delivered, Tinnemeyer's six year old grandson was kidnapped from his home by at least three men. During their investigation, law enforcement officials located Tinnemeyer's motor home in Mississippi and Tinnemeyer and Leavy in Riverside, California.  Agents also recovered $3.5 million from a storage unit rented on Tinnemeyer's behalf.

Law enforcement conducted surveillance on the residences of Defendant Lopez-Buelna and fugitive Defendant Jesus Gastelum, executed search warrants, and recovered a .22 caliber firearm in the master bedroom of Defendant Lopez-Buelna's residence.

On October 18, 2008, three days after he was kidnapped, Tinnemeyer's grandson was released and identified after he boarded a Las Vegas ParaTransit Bus and asked to be taken

home.

## II.    THE MOTIONS

### A.    Motion to Seat Defendants at Table Nearest to the Jury (ECF No. 183)

Defendant Roberto Lopez filed this Motion to Seat Defendants at the Counsel Table Nearest to the Jury.  The title of the Motion effectively summarizes the relief Defendant Lopez is requesting:  Defendant Lopez would like the Court to seat him and the rest of his co-defendants at the counsel table closer to the jury.  Although Mr. Lopez acknowledges that this table is customarily reserved for the Government, he contends that the interests of due process would be best preserved by allowing the defendants to sit beside the jury box.  The Government filed a Response (ECF No. 189), and Defendant Lopez filed a Reply (EFC No. 230).  None of the other defendants have joined in this Motion.  For the reasons that follow, the Motion will be denied.

Defendant Lopez is correct that the Supreme Court has emphasized the need to scrutinize courtroom practices.  In *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976), Chief Justice Burger explained that:

> In the administration of criminal justice, courts must carefully guard against the dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.  The actual impact of a particular practice on the judgment of jurors cannot always be fully determined.  But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny.  Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

Citing to several studies conducted in non-courtroom environments that claim people respond better to those who are physically closer to them, Defendant Lopez claims that seating the defendants further from the jury than the prosecutors impinges on the defendants' fundamental rights, and therefore requests, pursuant to *Estelle*, that the Court closely

scrutinize the seating arrangements in the courtroom.

As has already been noted, there will be four defendants present for the course of the trial. With their full team of attorneys, paralegals, interpreters, and technical personnel, defense counsel have indicated that at least eleven people will need to be present at the defendants' counsel table, and several more will need to be in close proximity. Security personnel will also be present in close proximity to the defendants and the two defendants in custody may need to be shackled. These facts all cut against Defendant Lopez's request.

First, it would be impossible to have all the defendants sit at the counsel table nearest to the jury without causing one or more defendants to have either his back to the jury, his back to the middle area of the courtroom, or be obscured--from the view of the jurors--by the other people at counsel table. This is particularly true in light of the number of attorneys, interpreters and defense team support staff that will be sitting at the defense table and the fact that the podium and projector are located on the side closest to the jury. However, by seating the defendants on the opposite side of the courtroom as is currently the plan, the defense counsel tables can be arranged in an "L" shape, thereby allowing all of the defendants a view of the entire courtroom, including the jury box. Additionally, some of the defendants will even be seated facing the jury from across the room.

Second, the security concerns associated with this trial require that the defendants not be seated immediately adjacent to the jury. While defendant Lopez is out of custody, two of his co-defendants are not. There is no entrance to the defendants' holding cell on the wall along which the jury box sits; there is only one entrance to the cell and it is immediately behind the traditional defense tables. This door allows for swift removal of any of the defendants should they pose a threat or should a threat be posed to them. Further, the far greater amount of free space on the side of the courtroom typically reserved for the defense will more easily handle the number of security personnel required for this case than could be

accommodated on the side containing the jury box, as the jury box takes up much of that half of the courtroom.

But even more importantly, keeping the defendants on the side of the courtroom typically designated for defendants will minimize, rather than exacerbate, the potential prejudice they could face.  If the defendants were to sit near the jury box, it is far more likely that the jurors would see any security restraints such as their shackles--even with the benefit of a skirted table--than if they are seated on the other side of the room facing the jury but behind a skirted table.  If possible, the Court would like to avoid a situation where any restraints would potentially be visible to the jury. *See generally Deck v. Missouri*, 544 U.S. 622 (2005) (explaining that visible shackles are generally disfavored during criminal proceedings).  If the defense is seated close to the jury and, after trial begins, restraints are required to be placed on the defendants during the 4-6 week span of the trial, the defense table might need to be moved to the opposite side to conceal the restraints from the jury's view.  This sudden rearrangement after the commencement of the trial would likely raise the curiosity of jurors and cause them to speculate, especially if this occurred after inappropriate conduct by one of the defendants.

Additionally, if the defense were seated on the side of the courtroom nearest the jury as requested, security concerns would require that security personnel be posted between the defendants and the jurors.  This would underscore and amplify the presence of the security personnel in the eyes of the jurors and could more easily lead to the inference that the defendants are dangerous individuals.  Further, it would obscure the jury's view of the courtroom and contribute to obscuring the defendants from the jurors' view, as well.

However, if the defendants sit on the side of the courtroom opposite the jurors, the security personnel will have room to sit and can blend into the background a bit more easily and will not have to physically stand between the jurors and the defendants.  Such an

arrangement is preferable to this Court and is in the interest of both visibility, security, and avoidance of prejudice, *see United States v. Jackson*, 549 F.2d 517, 526-27 (8th Cir. 1977) (noting the importance of shielding jurors from exposure to security measures as much as possible).  Accordingly, Defendant Lopez's Motion will be DENIED.

However, the Court will GRANT Defendant Lopez's request for an instruction advising the jurors that they are not to draw any inferences from the seating arrangements.

### B.    Motion to Exclude Polygraph Evidence (ECF No. 187)

In this Motion, the Government seeks to exclude the results of polygraph tests performed on various potential witnesses and one Defendant--Defendant Webster.  The Motion does not, however, seek to preclude the statements voluntarily taken from individuals during the course of the polygraph examinations.  No Response has been filed.

The Ninth Circuit has "long expressed [its] hostility to the admission of unstipulated polygraph evidence." *United States v. Cordoba*, 104 F.3d 225, 227 (9th Cir. 1997). Nevertheless, there is no longer a *per se* rule excluding all unstipulated polygraph evidence from criminal and civil trials. *See id.* at 227-228.  However, a trial court may exclude the results of polygraph examinations under Federal Rule of Evidence 403 if their probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by the considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *See United States v. Benavidez-Benavidez*, 217 F.3d 720, 725-26 (9th Cir. 2000).  The Ninth Circuit reviews a "district court's decision to exclude polygraph evidence under Rule 403 with considerable deference." *United States v. Cordoba*, 194 F.3d 1053, 1063 (9th Cir. 1999) (internal quotation marks omitted).

Exclusion is appropriate here.  Because the Government does not object to appropriate uses of the statements that were given during the course of the polygraph examination, the only evidentiary use for the admission of the polygraph results would be to detract from or

support the credibility of the witnesses.  However, this would diminish the jury's role in making credibility determinations, *see United States v. Scheffer*, 523 U.S. 303, 313 (1998) (explaining that "[b]y its very nature, polygraph evidence may diminish the jury's role in credibility determinations"), and poses the risk of the jury substituting the credibility determination made by the polygrapher for their own.  This danger is particularly worrisome because of the questionable accuracy of polygraph examinations, as well as the disagreement over their reliability, *see Scheffer*, 523 U.S. at 309, combined with the fact that polygraphs have a "misleading reputation as a truth teller," *see Dixon v. City of Coeur d'Alene*, No. 2:10-cv-00078-LMB, 2010 WL 4867363, at *3 (D. Idaho Nov. 23, 2010) (internal citation omitted).  Indeed, "polygraph evidence has grave potential for interfering with the deliberative process." *Cordoba*, 104 F.3d at 228.

The fact that one of the people who submitted to a polygraph test is a defendant in this case makes no difference.  The Ninth Circuit has routinely upheld district courts' decisions to exclude the results of a defendant's polygraph exam. *See, e.g., Benavidez-Benavidez*, 217 F.3d at 726; *Cordoba*, 194 F.3d at 1063.  Accordingly, the Government's unopposed motion will be GRANTED.

### C.    Motion to Admit Statements of Defendant Lopez-Buelna (ECF No. 188)

In this Motion, the Government asks the Court to admit statements made by Defendant Lopez-Buelna to Special Agent Daniel Leon of the FBI.  The Government contends that Defendant Lopez-Buelna was not in custody at the time he made the statements and argues that, even if he were, the public safety exception to *Miranda v. Arizona*, 384 U.S. 436 (1966) applies.  Defendant Lopez-Buelna filed a Response (ECF No. 195) in which he contends that he was in custody at the time the statements were made and that his verbal and nonverbal statements are irrelevant and unfairly prejudicial.  The Government provided an additional proffer of evidence at the January 20, 2011 hearing and Defendant Lopez-Buelna claims he

was handcuffed to the hospital bed at the time the statements were provided.

             1.        The Statements

On October 17, 2008, while watching his residence but prior to executing a warrant on it, Las Vegas Metropolitan Police Department ("LVMPD") detectives saw Defendant Lopez-Buelna drive past them. The detectives stopped Defendant Lopez-Buelna and placed him in handcuffs in the back of a police car. However, Defendant Lopez-Buelna began complaining of chest pains, so paramedics were called and he was transported to the hospital in an ambulance. It is unclear whether his handcuffs were removed once he was placed in the ambulance. Special Agent ("SA") Leon and Detective Miller of the LVMPD followed the ambulance to the hospital, knowing that Defendant Lopez-Buelna was a suspect in the kidnapping and that the missing boy had still not been found.

Once at the hospital, Defendant was placed in 5' x 7' or 6' x 10' section of a larger room which was partitioned by a curtain. The Defendant claims he was handcuffed to the bed, however SA Leon does not recall if he was handcuffed. While the doctors were attending to the Defendant inside the partitioned area, SA Leon and Detective Miller stood on the opposite side of the curtain partition. When the doctors were done, they advised SA Leon and Detective Miller they could go inside of the partition and speak with Defendant Lopez-Buelna. They did so, and SA Leon introduced himself as an FBI agent who wanted to ask some questions.

Defendant Lopez-Buelna did not respond to any of SA Leon's questions for the first five minutes of the interview. SA Leon then took out his own Blackberry, brought a photo of Tinnemeyer's missing grandson onto its screen, and then held the Blackberry six to eight inches from Lopez-Buelna's face. When Lopez-Buelna moved his head to avoid looking at the photo, SA Leon leaned over him and kept the Blackberry six to eight inches from his face. SA Leon then asked Defendant Lopez-Buelna if he knew the boy's grandfather, Tinnemeyer.

Defendant Lopez-Buelna allegedly then turned red, began to tap his feet together, and told SA Leon "you seem to know everything."

SA Leon asked Defendant Lopez-Buelna if he knew whether the boy was dead or alive, and then Lopez-Buelna allegedly became "very fidgety, exhaled loudly, and continued to try and look away from the picture of [the boy]." SA Leon asked if Defendant Lopez-Buelna knew why he was asking him about the boy's location, and Lopez-Buelna responded that SA Leon "seemed to know everything so why should he answer." SA Leon asked if Defendant Lopez-Buelna had sent any of his relatives to take the boy from his home, at which point Defendant Lopez-Buelna's eyes allegedly widened and he turned away from SA Leon. SA Leon then asked Lopez-Buelna how he would feel if someone came into his home and took one of his children. Defendant Lopez-Buelna allegedly then began to "tear up" and indicated that he had nothing to say and all he wanted to do was sleep. SA Leon stopped questioning Defendant Lopez-Buelna at that point.

The entire exchange allegedly lasted fewer than twenty minutes. No *Miranda* warning was given before or during the course of this interview. By the time SA Leon and Detective Miller left, an agent for United States Immigration and Customs Enforcement had arrived at the hospital. The Government believes that there were other law enforcement personnel at the hospital monitoring Defendant Lopez-Buelna for the duration of his stay there.

2.    Discussion

a.    Custodial Interrogation

*Miranda* warnings need only be given to a suspect in "custodial interrogation," which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444; *Stanley v. Schriro,* 598 F.3d 612, 618 (9th Cir. 2010) ("Under clearly established federal law, *Miranda* warnings are required only where there has been such a restriction on a

person's freedom as to render him in custody." (citations and internal quotation marks

omitted)). "[C]ustody must be determined based on how a reasonable person in the suspect's

situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662

(2004). This requires a court to consider:

> First, what were the circumstances surrounding the interrogation; and
> second, given those circumstances, would a reasonable person have felt
> he or she was not at liberty to terminate the interrogation and leave.
> Once the scene is set and the players' lines and actions are
> reconstructed, the court must apply an objective test to resolve the
> ultimate inquiry: was there a formal arrest or restraint on freedom of
> movement of the degree associated with a formal arrest.

*Thompson v. Keohane,* 516 U.S. 99, 112 (1995) (footnote and internal punctuation omitted);

*see also Stansbury v. California,* 511 U.S. 318, 322 (1994) (per curiam) ("In determining

whether an individual was in custody, a court must examine all of the circumstances

surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal

arrest or restraint on freedom of movement of the degree associated with a formal arrest."

(citations omitted)).

   In assessing whether a hospitalized individual is in custody, courts often look to the

atmosphere and physical surroundings at the hospital to determine whether there was restraint

or compulsion by police officers or other state actors. *Gonzalez v. Sisto,* No. EDCV 07-760-

RGK(OP), 2010 WL 1994869, at *10 (C.D. Cal. Jan. 13, 2010). "If the police took a criminal

suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed

themselves outside the door, arranged an extended treatment schedule with the doctors, or

some combination of these, law enforcement restraint amounting to custody could result."

*United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985).

   Here, many of the factors set forth in *Martin* were present. Although SA Leon and

Detective Miller were not the ones who actually transported Lopez-Buelna to the hospital,

they followed the ambulance all the way there.  At the hospital, Lopez-Buelna was possibly handcuffed to his hospital bed, but SA Leon and Detective Miller stationed themselves outside of Lopez-Buelna's curtained partition while doctors attended to him.  When the doctors left and SA Leon and Detective Miller were advised they could enter, SA Leon identified himself to Defendant Lopez-Buelna as an FBI agent.  SA Leon questioned Defendant Lopez-Buelna unsuccessfully then took out his Blackberry displaying a photo of the missing boy.  SA Leon held it six to eight inches from Defendant Lopez-Buelna's face.  When Lopez-Buelna tried to move his face to get away from the photo, SA Leon leaned over him and followed his face with the Blackberry.  This is certainly a situation in which a reasonable person would not have felt free to terminate the interrogation and leave, particularly if Defendant Lopez-Buelna was handcuffed to the bed for the duration of the interview and was guarded by members of the law enforcement community during his entire stay at the hospital.  Thus, Defendant Lopez-Buelna appears to have been in custody.

### b.    The Public Safety Exception

Regardless whether Defendant Lopez-Buelna was in custody at the time he made the statements proffered by the Government, the public safety exception to *Miranda* applies; therefore, Defendant Lopez-Buelna's statements may be admitted.  Although statements made by a defendant as the result of a custodial interrogation are normally excluded under *Miranda* when a proper *Miranda* warning was not given, the Supreme Court has articulated a narrow exception to this rule where the safety of the public is in danger. *See New York v. Quarles*, 467 U.S. 649, 654-66 (1984).

In *New York v. Quarles*, the Supreme Court was confronted with a situation in which police officers were pursuing an alleged rapist who was reported to be in possession of a handgun. *Id.* at 651-52.  One police officer found the suspect in a supermarket, but temporarily lost sight of him. *Id.* at 652.  Eventually, the officer caught up with the suspect

and frisked him, discovering a shoulder holster that was empty. *Id.* After handcuffing the suspect, the officer asked him where the gun was. *Id.* The suspect nodded in the direction of a few empty cartons and said "the gun is over there." *Id.* The officer retrieved a .38 caliber revolver from one of the cartons and formally placed the suspect under arrest. *Id.* At the suspect's trial for criminal possession of a weapon, the trial court suppressed the gun and the statement because the defendant had not been given a *Miranda* warning. *Id.* at 651. The Supreme Court reversed those rulings, finding that the public safety exception applied.

In reaching this conclusion, the Supreme Court explained:

> In such a situation, if the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda majority was willing to bear that cost. Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

*Id.* at 657. Likewise, the potential that Defendant Lopez-Buelna might have failed to respond if he had first been given *Miranda* warnings could have negatively affected the public safety, specifically that of the missing boy. Had Defendant Lopez-Buelna been deterred from responding to SA Leon's questions, the cost to the public could have been more than just the inability to obtain evidence to convict Lopez-Buelna; the cost could have been the life or safety of the missing boy.

Even SA Leon's question about how Defendant Lopez-Buelna would feel if his child were kidnapped did not appear to be designed to elicit evidence to be used to convict Lopez-

Buelna; but rather to elicit an emotional response that would help lead to the discovery of the missing boy.  It was objectively reasonable for SA Leon to believe that interviewing Defendant Lopez-Buelna was necessary to protect the boy from immediate danger. *See Petit-Homme v. McNeil*, No. 08-61019-CIV, 2009 WL 1884399, at *11 n.23 (S.D. Fla. June 30, 2009) (explaining that the public safety exception applies where it would have been objectively reasonable for the officer to believe that asking a question was necessary to protect the public or police from immediate danger).

Although the Ninth Circuit has not yet addressed whether the public safety exception applies when law enforcement interviews a suspected kidnapper in an effort to discover the location or condition of the victim, the Southern District of Florida has. *See Petit-Homme*, 2009 WL 1884399, at *11.  In *Petit-Homme*, the trial court determined that a suspect's responses to a police detective's questions regarding the location of kidnapped children would not have been excluded, even in the absence of *Miranda* warnings, due to the public safety exception to *Miranda*. *Id.*  Similarly, Defendant Lopez-Buelna's statements to SA Leon will not be excluded here.

Admitting Defendant Lopez-Buelna's statements is also consistent with the "rescue doctrine" exception to *Miranda* embraced by California courts.[1]  In *People v. Dean*, 39 Cal. App. 3d 875, 879 (1974), a federal agent met a kidnapping suspect at the ransom drop; ordered him to drop his gun; handcuffed him; and then asked the suspect where the victim was.  In response, the suspect named the address where the victim was ultimately found and also provided information about the car that was going to pick him up. *Id.*  Those statements were admitted at trial, despite the fact that *Miranda* warnings were not given, and the Court of Appeals affirmed. *Id.* at 886.  The Court of Appeals explained that "[w]hile life hangs in the

---

[1] As one commentator has explained, these "rescue doctrine" cases "logically fall under *Quarles* because they include a substantial threat to someone's safety and involve emergency situations." Alan Raphael, *The Current Scope of the Public Safety Exception to Miranda Under New York v. Quarles*, 2 N.Y. City L. Rev. 63, 76 (1998).

balance, there is no room to require admonitions concerning the right to counsel and to remain silent." *Id.* at 882; *see also United States v. Jones*, 19 M.J. 961 (A.C.M.R. 1985) (applying the rescue doctrine exception to *Miranda* in military law proceedings). Such a doctrine allows for the efficient, speedy rescue of kidnapping victims, which is important because sometimes accomplices of the captured kidnapper are under instructions to kill the victim if the kidnapper has not returned within a specified time. *See id.* at 883. At other times, the victim could be harmed or dying or in a vehicle trunk, and might not otherwise be discovered for days or weeks. *Id.* at 883-84.[2]

The same rationale justifies the exception in this case. SA Leon's efforts to force Defendant Lopez-Buelna to disclose information to him occurred while a kidnapped six-year-old boy's life was still arguably at risk.

c.      Relevance of the Statements

The statements and conduct of Lopez-Buelna are relevant to whether he was involved in kidnapping or a conspiracy to kidnap the missing boy, and appear highly probative of the fact that Defendant Lopez-Buelna recognized or had knowledge of the child. Further, the fact that Defendant Lopez-Buelna repeatedly stated that SA Leon seemed to know everything, rather than disputing SA Leon's statements, could be viewed as probative of Defendant Lopez-Buelna's involvement in the kidnapping. Although Defendant Lopez-Buelna may be correct that his statements were merely "indicative of the fact that SA Leon was haranguing Defendant Lopez-Buelna until he received some sort of response," (Resp. 4:7-8, ECF No. 195) the statements could even more easily be viewed as evidence that Defendant Lopez-Buelna, at the very least, recognized the kidnapped child. However, the interpretation to be

---

[2] The facts of *People v. Krom*, 461 N.E.2d 276 (N.Y. 1984) justify such a concern. In *Krom*, a kidnapping suspect was given a *Miranda* warning after being placed in custody. *Id.* at 278. The suspect elected to not divulge any information until he had an attorney present, but it took so long to try to find a suitable attorney that, by the time the suspect finally led law enforcement officers to the location of his victim, his victim had already suffocated in the box in which she was being held captive. *Id.* at 278-79.

given goes to the weight of the evidence, not its admissibility, so it will be up to the jury to decide which explanation they will accept.    Accordingly, the Government's Motion will be GRANTED.

### D.    Motion to Play Surveillance Tape (ECF No. 197)

In this Motion, the Government is requesting that the Court allow it to play segments of a surveillance video made by the surveillance system of the ParaTransit bus that picked up the child when he was released by his kidnappers on October 18, 2008.  Defendant Lopez-Buelna filed a Response (ECF No. 205), in which he contends that the surveillance footage is not relevant and will only serve to unfairly prejudice the jury against him.  The Government filed a Reply (ECF No. 240), in which it argues that the tape was not cumulative; not prejudicial; and necessary in order to prove the child's age.

The Government intends to play a portion of the surveillance video that begins at 10:30:07 p.m. on Saturday night, when the bus driver exclaims "look at that kid." (Mot. 2, ECF No. 197.)  The video then shows the entry of the child, his request to be taken to "[his home address]" (Video time-stamped 10:30:36 pm), the bus driver's call to his dispatcher, and a passenger's 911 call.  The boy claims that he did not run away (10:31: 09 pm), and indicates that a male left him there on the street a "couple of minutes" before (10:32:19 pm).  He also explains that he had not seen his mom since Wednesday (10:39:52 pm), and that he was with a "guy" who knows his grandpa (10:40:21 pm).  He indicates that he is six years old (10:33:20 pm).

The portion of the tape the Government initially intended to play also contains an exclamation by a bus passenger to the effect of, "Oh, no, no, no.  You mean the one that was taken from Mexico for the drugs?  I don't think that's him."  This exclamation begins at 10:40:57 pm.  However, the Government agreed at the January 20, 2011 hearing to redact that statement from the video.  Accordingly, the Motion will be GRANTED, with the stipulated

exclusion of the statement beginning at 10:40:57 must not be shown.

### E.    Motion to Exclude Statements of Co-Defendant Vega-Rubio (ECF No. 200)

In this Motion, Defendant Lopez-Buelna asks the Court to exclude a statement by Defendant Vega-Rubio that implicates Defendant Lopez-Buelna in the kidnapping that is the subject of this case.  The Government filed a sealed Response (ECF No. 222), in which it proposes to redact the portions of Defendant Vega-Rubio's statement that implicate Defendant Lopez-Buelna.  Defendant Lopez-Buelna indicated that he is satisfied with the redacted version of the statement attached to the Response and has withdrawn his Motion under the condition that the redacted version of the statement be used.

### F.    Motion for a Jury Questionnaire (ECF No. 201)

Defendant Lopez-Buelna filed this request for the use of a case-specific jury questionnaire during the jury selection process because he believes that it would help expedite the process and ensure that a fair and impartial jury is impaneled.  No Response has been filed.

Although the Court appreciates Defendant Lopez-Buelna's desire to ensure that the proceedings run quickly and smoothly, it is not convinced that a written jury questionnaire is necessary to achieve this, nor has Defendant Lopez-Buelna made a sufficient showing that such a procedure is required.

The Court's oral questioning during voir dire will provide sufficient constitutional safeguards to ensure that a fair and impartial jury is selected.  Indeed, the Court has even invited the parties to submit their own proposed questions for the potential jurors (*see* Am. Order Regarding Trial 3, ECF No. 184), many of which the Court anticipates using during the voir dire.  Accordingly, the Court will consider the questions contained in the proposed jury questionnaire that Defendant Lopez-Buelna enclosed with his Motion.  Therefore, Defendant's Motion is DENIED.

### G.   Motion to Exclude Drug Organization Evidence or Opinion Evidence (ECF No. 204)

Defendant Webster is requesting that the Court preclude the Government from producing an expert witness who will testify about "drug trafficking, drug trafficking organizations and the laundering of drug proceeds" (Mot. 3:15-16, ECF No. 204), because such testimony would be irrelevant and unfairly prejudicial, particularly if the expert characterizes Defendants as members of a "Mexican cartel."   Defendant Vega-Rubio has moved to join this Motion (ECF No. 228).   The Government has filed a Response (ECF No. 236).

The expert Defendant Webster wishes to preclude from testifying is DEA Special Agent Christopher Cadogan, who will testify as to the modus operandi of drug distribution organizations.   However, as even Defendant Webster acknowledges (Mot. 6:16-18, ECF No. 204), the Ninth Circuit does allow such expert testimony in multi-defendant drug cases involving a conspiracy to distribute contraband. *See United States v. Espinosa*, 827 F.2d 604, 612 (9th Cir. 1987) ("Law enforcement officers with sufficient qualifications may testify concerning the methods and techniques employed in an area of criminal activity"); *see, e.g., United States v. Bailey*, 607 F.2d 237, 240 (9th Cir. 1979).

Defendant Webster also contends that there is not sufficient evidence of a drug distribution conspiracy in this case to warrant an expert's testimony concerning the manner in which drug distribution organizations operate.   However, the Court is not persuaded.   As the Ninth Circuit has explained, testimony concerning the modus operandi of drug trafficking organizations is appropriate when the government can produce evidence of the sort of activities commonly associated with drug trafficking. *See United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir. 1995).   Such activities often appear innocuous at first and, if reviewed separately, might not give rise to the suspicion that drug trafficking is occurring, but, when

viewed as a whole, can lead to the conclusion that drug trafficking is occurring. *See Gil*, 58 F.3d at 1418-19.

Here, the Government has indicated that it will proffer evidence that some of the defendants were involved in an organization based in Las Vegas that sent motor homes across the United States and occasionally to Mexico and Canada. These motor homes were equipped with secret compartments and typically had a scout car driving ahead or behind the motor home accompanying them to their destinations. Once at the destination, the drivers would leave the motor homes in a designated spot for a designated period of time. Sometimes they would exchange keys with another individual. Once the designated period of time was over, the driver would return to the motor home and drive to the next destination, repeating the same conduct once there.

The Government also proffered that two witnesses will explain what they believed to be cocaine in the secret compartments of these motor homes. Additionally, the Government will proffer a witness who will testify that he was one of these motor home drivers for several years, during which time he told his friends and family that he traveling across the country building homes, though he actually never built any homes. He will testify that he made up this lie because he knew what he was doing was illegal, though he did not know exactly what he was carrying. The Government also explains that the $3.5 million recovered from Tinnemeyer is wrapped in plastic in a manner that is consistent with the manner in which drug trafficking organizations normally bundle their cash. All of this, taken together, provides a sufficient factual basis for the Government to be able to call SA Cadogan, as these activities are consistent with drug trafficking. Therefore, Defendant Webster's Motion to Exclude Drug Organization or Opinion Evidence will be DENIED.

Further, the Government may refer to such conduct as "drug trafficking/distribution operations." The Government has, however, agreed to refrain from making references to

"Mexican cartels" or characterizing the defendants as members of such "cartel" organizations unless it lays a sufficient basis for using the terms,

### H. Motion for Exclusion of Testimony Concerning Defendant Webster's Prior Drug Use (ECF No. 209)

In this Motion, Defendant Webster seeks to preclude any testimony regarding his alleged prior drug use on the basis that such testimony would be irrelevant; would be inadmissible character evidence; or, if relevant, unfairly prejudicial.  At Calendar Call on January 18, 2011, the Government agreed that the motion could be granted as to its case in chief, but asked to reserve the right to proffer such evidence on cross-examination or rebuttal, if necessary.  Accordingly, Defendant Webster's Motion will be GRANTED.  The Government may not introduce evidence regarding Defendant Webster's alleged prior drug use during their case in chief; however, they may seek to admit such evidence on rebuttal or cross-examination for purposes of impeachment, if Defendant Webster chooses to testify.

### I. Motion to Preclude the Use of the Transcript from Defendant Lopez-Buelna's Plea Hearing (ECF No. 215)

In this Motion, Defendant Lopez-Buena asks the Court to exclude the transcript of his plea hearing in 2:08-cr-00292-GMN-PAL, in which Defendant Lopez-Buelna plead guilty to illegal reentry.  Defendant Lopez-Buelna contends that the transcript is inadmissible because it is irrelevant; the danger of prejudice from the transcript substantially outweighs any probative value it might have; and the transcript contains inadmissible character evidence. The Government has filed a Response (ECF No. 219), in which it indicated that it only intends to introduce the transcript in rebuttal if any of the defendants charged with Conspiracy to Commit Hostage Taking or Hostage Taking assert the affirmative defense that all of the alleged offenders in the hostage taking counts were nationals of the United States.  At the January 20, 2011 Hearing before this Court, Defendant Lopez-Buelna indicated that he would

stipulate to the fact that he is not a United States national, which was satisfactory to the Government.  Accordingly, this Motion will be GRANTED.  The Government does, however, reserve the right to use the transcript on rebuttal should any of the defendants attempt to argue that Defendant Lopez-Buena is a United States national.

## <u>CONCLUSION</u>

**IT IS THEREFORE ORDERED** that Defendant Roberto Lopez's Motion to Seat Defendants at Counsel Table Nearest to the Jury (ECF No. 183) is DENIED.

**IT IS FURTHER ORDERED** that the Government's Motion to Exclude Polygraph Results (ECF No. 187) is GRANTED.

**IT IS FURTHER ORDERED** that the Government's Motion to Admit Statements of Defendant Lopez-Buelna (ECF No. 188) is GRANTED.

**IT IS FURTHER ORDERED** that the Government's Motion to Play Surveillance Tape (ECF No. 197) is GRANTED under the condition set forth in this opinion.

**IT IS FURTHER ORDERED** that Defendant Lopez-Buelna's Motion to Exclude Statements of Co-Defendant Vega-Rubio (ECF No. 200) is DENIED as moot.

**IT IS FURTHER ORDERED** that Defendant Lopez-Buelna's Motion for a Jury Questionnaire (ECF No. 201) is DENIED.

**IT IS FURTHER ORDERED** that Defendant Webster's Motion to Exclude Drug Organization Evidence or Opinion Evidence (ECF No. 204) is DENIED under the condition set forth in this opinion.

**IT IS FURTHER ORDERED** that Defendant Webster's Motion for Exclusion of Testimony Concerning Defendant Webster's Prior Drug Use (ECF No. 209) is GRANTED under the condition set forth in this opinion.

**IT IS FURTHER ORDERED** that Defendant Lopez-Buelna's Motion to Preclude the Use of the Transcript from his Plea Hearing (ECF No. 215) is GRANTED under the condition

set forth in this opinion.

DATED this 21st day of January, 2011.

_____
Gloria M. Navarro
United States District Judge